

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

April 23, 1959

Mr. William A. Harrison
Commissioner of Insurance
International Life Building
Austin, Texas

Dear Sir:

Opinion No. WW-602

Re: What constitutes "one building
site and office building" as used
in Article 3.40 of the Insurance
Code.

You have asked the opinion of this office as to the definition of
the phrase "one building site and office building for its accommodation
in the transaction of its business and for lease and rental" as used in
Article 3.40 of the Insurance Code as well as its application to a spe-
cific fact situation set out in your opinion request as follows:

> "Attached hereto you will find a photostatic
> copy of a plat of a certain city block. The entire city
> block is now owned by XYZ Life Insurance Company.
> On tract 'A' is a twenty-story steel frame brick build-
> ing which is the home office building of XYZ Life In-
> surance Company. The company acquired tract 'A' on
> December 27, 1950, at a cost of $575,000. The build-
> ing was commenced in January, 1952, and was com-
> pleted in February, 1953. At the present time the up-
> per nine stories of the building are under a thirty year
> lease to one tenant, and the remaining eleven stories
> are occupied by the insurance company and tenants
> who have short-term leases. The insurance company
> occupies space on seven floors, which if consolidated
> would take up only a little more than three floors in
> the building.
>
> "Tract 'B' is an unimproved concrete and dirt
> lot, an undivided one-half of which is owned by Com-
> pany XYZ and is used for access and parking area.
> One-half interest in this property was acquired by the
> company on February 13, 1953 for a cash considera-
> tion of $125,000.
>
> "On tract 'C' is a six-story concrete parking
> garage building which is owned by XYZ Life Insur-
> ance Company. The tract of land was acquired by the
> company on December 27, 1950, for a $230,000 cash
> payment. The parking garage was commenced in Janu-
> ary, 1952 and completed in February, 1953. The garage

is a public parking facility and the income from its operation accrues to the insurance company.

"Tract 'D' was acquired in two parcels, the first being on April 1, 1957, for $243,000, and the second parcel on April 1, 1958, for $775,000.

"Therefore, Company XYZ, since the purchase of one original building site on December 27, 1950, and the completion of the home office building and parking garage in February, 1953, has made direct cash purchases of the various remaining tracts within the city block on different dates and in varying amounts. The total investment by the company in the properties is $7,912,983.10. This does not exceed the percentage limitation in Article 3.40.

"Company XYZ has indicated that it proposes to enter into a long term lease with a building corporation under the terms of which the lessee will erect a thirty-story office building on tract 'D'. The new building will be adjacent to and connected with the present home office building of the insurance company and the parking garage. Company XYZ will have an option to purchase the building from the lessee."

Statutes governing insurance companies have uniformly contained limitations on the amount of real estate which such companies may acquire, the manner of its acquisition, and time limits within which they must dispose of property whose initial acquisition was permitted but the continued retention of which by the companies was prohibited. Article 3.40 of the Insurance Code is a representative example:

"Every such insurance company may secure, hold and convey real property only for the following purposes and in the following manner:

"1(a). One building site and office building for its accommodation in the transaction of its business and for lease and rental; and such office building may be on ground on which the company owns a lease having not less than fifty (50) years to run from the date of its acquisition by the company, provided that the company shall own, or be entitled to the use of, all the improvements thereon, and that the value of such improvements shall at least equal the value of the ground, and shall be not less than twenty (20) times the annual average ground rentals payable under such lease; and provided such office building shall have an annual average net rental of at least twice such

annual ground rental; and provided further, that such company shall be liable for and shall pay all State and local taxes levied and assessed against such ground and the improvements thereon, which for the purposes of taxation shall be deemed real estate owned by the company. Provided that an acquisition of such an office building on leased ground shall be approved by the Board of Insurance Commissioners before such investment.

"...

"2. Such as have been acquired in good faith by way of security for loans previously contracted or for moneys due;

"3. Such as have been conveyed to it in the satisfaction of debts previously contracted in the course of its dealings;

"4. Such as have been purchased at sales under judgment or decrees of court, or mortgage or other liens held by such companies.

"All such real property specified in Subdivisions 2, 3 and 4 of this article which shall not be necessary for its accommodation in the convenient transaction of its business shall be sold and disposed of within five (5) years after the company shall have acquired title to the same, or within five (5) years after the same shall have ceased to be necessary for the accommodation of its business. It shall not hold such property for a longer period, unless it shall procure a certificate from the Board that its interest will suffer materially by the forced sale thereof; in which event the time for the sale may be extended to such time as the Board shall direct in such certificate. As amended Acts 1955, 54th Leg., p. 916, ch. 363, § 13."

This particular statute is somewhat different from that of other states in view of the rather unique limitation "one building site and office building." We can find no cases construing such a restriction in this or any other jurisdiction, nor are we aware of the existence of similar limitations in the insurance laws of other states without qualifying language allowing the acquisition of real property in addition to an office site where necessary for the accommodation of the company's business. Statutes of this kind were primarily enacted in consort with similar laws relating to corporations generally and were designed "to prevent property from falling into 'dead' or unserviceable hands or to limit monopolistic ownership and control of the land by concentrated wealth of corporations." Great West Life Assurance Co. v. Courier Journal Job Printing Co.,

288 S.W.2d 639 (Ky.App.). Following and as a result of the mellowing national attitude toward corporations many states have greatly liberalized by statutes the permissive real estate investments allowed insurance companies. This has not occurred in Texas.

The forerunner of Article 3.40 was Article 3096m relating to home life and accident companies enacted in 1895. It provided in part:

> "Article 3096m. No home company shall purchase or hold real estate except for the following purposes and in the following manner: The building in which it has its home office and the land upon which it stands; such as shall be requisite for its accommodation and the transaction of its business in this State, or any other state or country; such as shall have been acquired for the accommodation of its business; such as shall have been mortgaged to it in good faith by way of security for loans previously contracted or for moneys due. . ."

This provision was greatly restricted by the enactment in 1909 of Article 4726, Acts 1909, p. 196, Sec. 11, relating to life, accident and health companies and expressly repealing Article 3096m:

> "Sec. 11. Every such insurance company may secure, hold and convey real property only for the following purposes and in the following manner:
>
> "(1) One building site and office building for its accommodation in the transaction of its business and for lease and rental. Such as shall have been acquired in good faith by way of security for loans previously contracted or for moneys due. . ."

That the provision as to "one building site and office building" was deliberately restrictive can be seen by the fact that corresponding statutes affecting fire, marine and inland insurance companies in effect for many years prior to 1909 contained no such limitation; nor did those statutes affecting casualty insurance companies enacted in 1911.

The modern judicial tendency has been toward a liberal interpretation of these restrictions. For example, it is now well settled that an insurance company operating under these or similar restrictions is not limited in the size of its building to a structure merely adequate to its then existing needs and no larger. Rather it may construct or acquire as large an edifice as the prudence of its board of directors, and other applicable statutes relating to insurance company investments, dictate. Those portions of the building not yet required by the company itself can be made available to tenants. Vol. 18, Appleman on Insurance Law and Practice, Sec. 10,015, p. 62, Nat'l. Reserve Life Ins. Co. v.

Moore, 219 Pac. 261, Volunteer State Life Ins. Co. v. Dunbar, 181 S.W. 159, Cyclopedia of Insurance Law, Couch, Vol. 1, Sec. 248, p. 585. This conclusion is reenforced in Texas by the addition to the statute of the words "and for lease and rental," an appendage not usually added to this type of statute in other states.

Likewise, the concept of what is properly within the meaning of the phrase "for its accommodation in the transaction of its business" and others of similar import has been greatly expanded by judicial construction. The purchase by an insurance company of a hospital to be used primarily but apparently not exclusively for the treatment of its employees afflicted with tuberculosis was upheld as being "requisite for its convenient accommodation in the transaction of its business." People ex rel. Metropolitan Life Insurance Co. v. Hotchkiss, 120 N.Y. Supp. 649 (1909). In two cases involving the proposed ownership by insurance companies of housing projects, such ownership being specifically authorized by the insurance laws in force, it was contended that this would violate constitutional prohibitions against corporate ownership of real property "except such as may be necessary and proper for its legitimate business" or not "actually occupied by such corporation in exercise of its franchise." In both it was held that this proposed use did not violate the constitutional provision, the rationale apparently being that it was necessary for present day insurance companies to have a large field of permissive investments and that by making such investments the companies were acting in furtherance of their business. The fact that the real estate in question (now comprising one city block) has been purchased in piecemeal fashion over a period of time is entitled to but little significance in determining whether or not it constitutes "one building site." An analogous situation is discussed in the case of Board of Education of Orange County v. Forrest, et al., 130 S.E. 621 (N.C.Sup.). There the Board of Education selected a site for a consolidated school building containing slightly over six acres. This six acres was composed of two parcels of land, one of five plus acres and the other of 1.09 acres with a "street, road or alleyway" intervening. The Board was able to purchase the five acres immediately and proceeded to build the school building thereon. Being unable to reach an agreement as to price regarding the 1.09 acre tract, condemnation proceedings were instituted, such additional land to be used as a playground. It was contended that the Board was empowered to condemn only for school purposes or school buildings and was not authorized to condemn property for playgrounds contiguous thereto. The Court, however, points out that the Board is allowed to acquire title to "sites" for buildings throughout its district and in this connection has the following to say:

"... The meaning of the word 'site' as used in the statute is broad enough to embrace such land, not exceeding the statutory limit, as may reasonably be required for the suitable and convenient use of the particular building; and land taken for a playground in conjunction with a school

may be as essential as land taken for the schoolhouse it-
self. 24 R. C. L. 582, § 31.

"It appears in the statement of facts that the plain-
tiff, after deciding to consolidate the schools, selected as
a site for the building a lot of more than six acres includ-
ing the lot in question; that upon the reasonable assump-
tion that title to each lot could be acquired by purchase,
the plaintiff erected a modern school building on the five-
acre lot; and that afterwards it became necessary to con-
demn the lot in controversy. In all these matters the
plaintiff was acting in the exercise of a discretion with
which the courts seldom interfere. (Citing cases.)

"Under the judge's findings of fact the process of
acquiring title to the five-acre lot by purchase and to the
one-acre lot by condemnation may be regarded as sepa-
rate stages in the accomplishment of a common purpose
to appropriate both lots for the benefit of the school.
Otherwise the plaintiff's original purpose would be de-
feated. . . ." (Emphasis supplied.)

It would appear then that the determination of whether a given tract of
land qualifies as "one building site" within the purview of Article 3.40
presents a question of fact which must be resolved by you.

However, it should be pointed out that the manner in which
property is purchased is but one of the factors which should be taken
into consideration by you in resolving the question. The matter is ex-
cellently summarized in Garfield v. Equitable Life Assurance Society,
164 N.Y.S.2d 823 (N.Y.Sup.), as follows:

"Singleness is to be determined not solely by the
purchase but by the plan as well and its essential and
natural implications, its purposes and policy."

Of course, unrelated acquisitions of separate parcels of real estate which
do not reasonably appear to be motivated by any particular plan looking
toward their ultimate utilization as a "unit" would be beyond the purview
of Article 3.40.

What constitutes an "office building" within the meaning of Article
3.40 likewise presents a fact question which you must determine.

In Rice, Att'y. Gen. v. Board of Police Com're. of City of Woon-
socket, 97 A. 19 (R.I.Sup.) it was contended that certain connected struc-
tures constituted a "building" within a statutory prohibition against the
issuance of a liquor license for the sale of liquor in any building within
200 feet of a school. The Court held that the structures in question rep-
resented three distinct buildings, basing this conclusion on the following

facts: "It was built at a different time, upon a different plan, and for a different purpose. There is no interior connection or means of passage between the two." On the other hand, we find the case of State v. Crause, 104 A. 525 (Me.Sup.), which announces that "a building may constitute an entire block, consisting of separate and independent tenements, one of which may be occupied for a dwelling house and another for a store." Citing State v. Spence, 38 Me. 32.

An analogy to the restrictions of Article 3.40 is furnished by corresponding constitutional provisions and statutes relating to banking which contain limitations as to a "banking house" and engaging in business at more than "one place." A proposal to house banking facilities in a building to be constructed in the next block to the existing bank, connected by pneumatic tubes and a closed circuit TV was held a violation of Article 342-903 in Attorney General Opinion WW-22. A similar addition, joined to the original by a tunnel below the street, was held within the statutory and constitutional limitation in Attorney General Opinion V-1046:

"If the new structure, when built, becomes a part of the bank's 'banking house' then the proposed plan will not violate the provisions of said Article.

"The contemplated new structure, although to be erected across the street from the original 'banking house,' will be physically joined thereto by a tunnel under the street, which you state will be suitable for passage back and forth. It is evident that besides being joined physically, the new structure, including the passageway, will be in close proximity to the present building. It will be used in connection with the original building and as a unit will be devoted to one general common purpose. It is our opinion that the two structures will in reality be one and when used in the manner proposed will constitute the bank's 'banking house.' . . ." (Emphasis supplied.)

Also pertinent is Attorney General Opinion R-1746:

"The emphasis appears to be on the singleness of the place at which the banking operation is conducted.
. . .

"The sole question is, then, whether the separate building or installation planned will constitute a separate place or banking house or will constitute but a part of one place or banking house. To resolve that question will require an examination into all of the facts and circumstances throwing light on the question, many of which

are not yet in existence. Physical proximity will be but an evidentiary fact for consideration. Physical communication by pneumatic tube is of similar limited significance. Any hypothesis must necessarily assume intention to use the separate buildings at an integrated, single business location. Intention is always a fact question if disputed."

While obviously in the banking field the emphasis is not on the singleness of the physical structure, the above are illustrative of the liberality with which restrictions of this type are interpreted and may be of some benefit to you in passing upon these questions.

We have been furnished as a supplement to the opinion request with a brief summary of various insurance buildings which in the past have been considered by the Board and the Commissioners. A comparison of those which have been rejected and those which have not shows that these matters have been treated correctly as questions of fact and the determining factor in each case has been whether or not the structure was considered by the Board as an "architectural unit."

In determining whether or not the proposed plan comprises an "architectural unit" the Board has apparently taken into consideration all the particular facts involved, such as its proposed use both present and future, its physical aspects, design and plan, the manner in which it was acquired, etc.

## SUMMARY

Whether or not a particular real estate investment of a life insurance company constitutes "one building site and office building," as the phrase is used in Article 3.40 of the Insurance Code, is a question of fact for determination by the Commissioner of Insurance.

Very truly yours,

WILL WILSON
Attorney General of Texas

By R. V. Loftin, Jr.
Assistant

RVL:lm

APPROVED:

OPINION COMMITTEE:

Geo. P. Blackburn, Chairman

J. Arthur Sandlin
William R. Hemphill
Tom I. McFarling
John Reeves

REVIEWED FOR THE ATTORNEY GENERAL
BY:
    W. V. Geppert